UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAMES L. MINNER,

          Plaintiff,

    v.

NAVIENT CORPORATION and
NAVIENT SOLUTIONS, LLC,

          Defendants.

**DECISION AND ORDER**

18-CV-1086S

## I.  INTRODUCTION

In this action, Plaintiff James Minner asserts state and federal claims against his student loan servicers for steering him to repayment options that harmed him financially, and for misreporting that he defaulted on his loans, thereby damaging his credit score. Defendants have moved to dismiss Minner's complaint for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to Rules 12 (b)(2) and 12 (b)(6) of the Federal Rules of Civil Procedure, and Minner has cross-moved to amend his complaint. (Docket Nos. 6, 10.) For the following reasons, Minner's motion is granted and Defendants' motion is denied.

As an initial matter, this Court grants Minner's motion to amend his complaint. (Docket No. 10.)  District courts have broad discretion to grant a party leave to amend its pleadings and the federal rules dictate that courts "freely give leave when justice so requires."  Fed. R. Civ. P. 15 (a)(2); <u>see also</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962); <u>Ellis v. Chao</u>, 336 F.3d 114, 127 (2d Cir. 2003). Given the procedural posture of this case, this Court finds it most expeditious and in the

interests of judicial economy to permit Minner to amend his complaint as proposed (Docket No. 10-5, pp. 1-22) and assess Defendants' Motion to Dismiss as against that pleading. Consequently, Minner's Motion to Amend (Docket No. 10) is granted, and Minner is directed to file his proposed amended complaint (Docket No. 10-5, pp. 1-22) with the Clerk of Court as the amended complaint and operative pleading in this matter.

Defendants' Motion to Dismiss is resolved below.


## II.  BACKGROUND

This Court assumes the truth of the following factual allegations contained in Minner's complaint. See Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 63 (2d Cir. 1997).

Plaintiff James Minner took out nine federal student loans between 2004 and 2010. (Amended Complaint, Docket No. 10-5, ¶ 23.) He entered into a Master Promissory Note with the Department of Education ("DOE") for these loans on March 22, 2004. (Id., ¶ 135.) These loans were originally serviced by Sallie Mae Corporation ("SLM") and Navient, LLC. (Id., ¶ 136.) In 2014, Defendant Navient Corporation ("NC") was formed as the successor to Sallie Mae and Navient, LLC. (Id., ¶ 51.) At that time, NC assumed the servicing and collection activities of Sallie Mae and Navient, LLC. (Id., ¶ 52.) NC assumed the managing and servicing of Minner's loans in 2014, and has done so since then. (Id., ¶ 54-55.)

Navient Corporation is a Delaware corporation, and is the nation's leading loan servicer. (Id., ¶ 52.) NC contracts with the DOE to service federal student loans. (Id.,

2

¶¶14, 53.) Defendant Navient Solutions, LLC, ("NSL"), is a wholly-owned subsidiary of NC. (Id., ¶ 10.) NC is the direct or indirect owner of all NSL stock. (Id., ¶ 5.) The companies share a website, and have a common president and CEO, chief operating officer, and chief risk officer. (Id., ¶ 7). NC is responsible for NSL's hiring and compliance auditing. (Id., ¶ 16.)

As loan servicers, Defendants are responsible for "managing borrower's accounts; processing monthly payments, assisting borrowers to learn about, enroll in, and remain in alternative repayment plans." (Id., ¶ 56.)

At some point, Minner was experiencing long-term financial problems. (Id., ¶ 59.) The website shared by Defendants states that forbearance is appropriate for borrowers who "have a problem making on-time payments due to a temporary financial difficulty." (Id., ¶ 60.) Forbearance is not usually suitable for borrowers experiencing long-term distress. (Id., ¶ 62). Borrowers in forbearance accrue unpaid interest and the addition of that unpaid interest to the principal balance of the loan. (Id., ¶ 63.) "Long-term enrollment in forbearance can dramatically increase the total amount due each month after the forbearance period ends." (Id., ¶ 65.)

Income-driven repayment plans are usually a better option for borrowers facing long- term financial hardship, because they allow borrowers to avoid the costs associated with forbearance. (Id., ¶ 66.)

In spite of the fact that Minner was experiencing long-term financial hardship, Defendants told Minner that his loans should be placed in forbearance. (Id., ¶¶ 67, 59.) Minner thus entered into forbearance. (Id., ¶ 71.)

It is less time-consuming—and thus less costly—for Defendants to enter borrowers

3

into forbearance than to process an application for income-driven repayment. (Id., ¶¶ 79-82). Because of this, Defendants incentivize their customer-service representatives to push borrowers into forbearance without exploring income-driven repayment plans, or sometimes without even mentioning them at all. (Id., ¶ 72.)

After being in forbearance status for some time, Minner switched to an income-driven plan, but during the forbearance period, interest accrued and was added to the principal balances of his loans. (Id., ¶ 85.) He could have avoided this cost by enrolling in the income-driven plan from the start. (Id., ¶ 85). Defendants advise borrowers who are similarly-situated to Minner to enter forbearance, and those borrowers also experience negative consequences. (Id., ¶¶ 83, 86.)

Defendants told Minner that while he was in forbearance, no default would occur on his loans. (Id., ¶ 88.) When Minner left forbearance and entered the income-driven plan, Defendants incorrectly reported to credit reporting agencies ("CRAs") that Minner had defaulted on his loans. (Id., ¶¶ 88-89.) Upon learning of these reports, Minner complained to the CRAs. (Id., ¶ 130.) The CRAs informed Defendants that Minner disputed their reports. (Id., ¶ 131.) Defendants failed to correct the reports stating that Minner had defaulted on his loans. (Id., ¶ 132.) Defendants have also mistakenly reported defaults of similarly situated consumers. (Id., ¶ 91.)

Before and during the forbearance period, Minner was working to pay off debt and improve his credit score. (Id., ¶¶ 95-96.) During the forbearance period, Minner improved his credit score by 100 points. (Id., ¶ 96.) This enabled him to qualify for a mortgage to refinance his home. (Id., ¶¶ 95-96.) Minner was preapproved to receive financing, and prequalified to refinance his mortgage. (Id., ¶ 97.) But after Defendants incorrectly

reported that Minner had defaulted, Minner's credit score fell approximately 120 points, and he was informed that he no longer qualified to refinance his mortgage. (Id., ¶¶ 101-102.) Since Defendants' incorrect reports, Minner has not been able to receive alternative financing for his mortgage. (Id., ¶103.) In addition, several of his credit lines were canceled. (Id., ¶ 105.)

## III. DISCUSSION

Minner alleges three causes of action against Defendants in his amended complaint. He alleges that Defendants engaged in deceptive acts and practices, in violation of New York General Business Law ("GBL") § 349. (Amended Complaint, ¶¶ 112-21.) He alleges that Defendants misreported and failed to correct false information in violation of the Fair Credit Reporting Act, 20 U.S.C. § 1681s-2(b). (Id., ¶¶ 122-133.) Finally, he alleges that Defendants are liable to him for breach of contract under New York law. (Id., ¶¶ 134-150.) He seeks compensatory and punitive damages and an order compelling Defendants to rescind their reports of default to the credit-reporting agencies.

Defendants move to dismiss Minner's claims for lack of personal jurisdiction as to Navient Corporation under Rule 12 (b)(2) and for failure to state a claim upon which relief can be granted as to both defendants under Rule 12 (b)(6) of the Federal Rules of Civil Procedure.

### A. Personal Jurisdiction

Defendants argue that this Court lacks personal jurisdiction over NC, a Delaware corporation with no presence in New York. Minner argues that this Court has personal jurisdiction because of the activities of NSL, the subsidiary and agent of NC.

On a motion to dismiss pursuant to Rule 12(b)(2), the plaintiff bears the burden of establishing that a court has personal jurisdiction over the defendant. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996) (citing Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)). "Where, however, the district court relies solely on the pleadings and supporting affidavits, the plaintiff need only make a *prima facie* showing of jurisdiction." Robinson, 21 F.3d at 507. Where the issue of personal jurisdiction is resolved on affidavits, the allegations are construed in the light most favorable to plaintiff, and all doubts are resolved in plaintiff's favor. A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993). In determining whether a plaintiff has made this showing, however, a court is not obligated to draw "argumentative inferences" in plaintiff's favor. Robinson, 21 F.3d at 507 (citing Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)).

To determine whether personal jurisdiction over a defendant exists, district courts must apply a two-part analysis. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). Specifically, the court must first determine whether there is jurisdiction over the defendant under the relevant forum state's laws. Metro. Life Ins., 84 F.3d at 567. If personal jurisdiction exists under the forum state's laws, the district court must then determine if the exercise of such jurisdiction complies with federal due process requirements. Id. As such, this Court must first examine if the exercise of jurisdiction over Navient Corporation, a corporation organized pursuant to Delaware law, is appropriate under New York's long-arm statute. See, e.g., Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).

### 1. New York Law

Defendants argue that this Court lacks personal jurisdiction over NC because it is merely a holding company that conducts no business in New York. Minner argues that NC is subject to personal jurisdiction based on NSL's actions in New York.

"Courts may assert two broad categories of jurisdiction over an individual action: specific jurisdiction, which arises when the defendant's activities in the forum are the subject of the action, and general jurisdiction, which arises out of a defendant's contacts with the forum even though those contacts themselves are unrelated to the action before the court." Langenberg v. Sofair, No. 03 CV 8339, 2006 WL 2628348, at *2 (S.D.N.Y. Sept. 11, 2006) (citing Bank Brussels, 305 F.3d at 127 and Commc'ns Partners Worldwide, Inc. v. Main St. Res., No. 04 Civ. 10003, 2005 WL 1765712, at *2-3 (S.D.N.Y. July 26, 2005)). New York law provides for both general and specific jurisdiction. The general jurisdiction of New York courts is codified at N.Y. C.P.L.R. § 301. See Langenberg, 2006 WL 2628348, at *2. Section 302 of the N.Y. C.P.L.R. is New York's long-arm statute, and it sets forth the requirements for the exercise of specific jurisdiction. See id. Minner cites § 302 in his briefing, yet also alludes to rules that establish general jurisdiction over a nondomiciliary through the presence of its subsidiaries. (See Docket No. 10-1 at 3.) This Court will accordingly analyze New York's jurisdiction over NC pursuant to both sections.

#### a. CPLR § 301

New York courts may exercise personal jurisdiction over a foreign corporation that is "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in [the state]." Jazini v. Nissan Motor Co., 148

F.3d 181, 184–85 (2d Cir. 1998) (citing <u>Delagi v. Volkswagenwerk A.G. of Wolfsburg,</u> <u>Germany</u>, 29 N.Y.2d 426, 430–31, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972) (applying N.Y. C.P.L.R. § 301)). Such jurisdiction can exist even if the cause of action is unrelated to the defendant's New York activities. <u>Id.</u> (citing <u>Taca Int'l Airlines, S.A. v. Rolls–Royce</u> <u>of England, Ltd.</u>,15 N.Y.2d 97, 102, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965)).

"New York law provides two grounds for the attribution to a foreign corporation of the acts of another entity for the purpose of assessing personal jurisdiction over a foreign corporation." <u>H. Heller & Co. v. Novacor Chemicals Ltd.</u>, 726 F. Supp. 49, 54 (S.D.N.Y. 1988), <u>aff'd sub nom.</u> <u>Heller & Co. v. Novacor</u>, 875 F.2d 856 (2d Cir. 1989). These are, first, if a court finds the entity is a "mere department" of the named defendant, and second, if the entity is acting as an agent of the named defendant. <u>Id.</u>

A subsidiary will be considered a "mere department" when the defendant's control over the subsidiary is "pervasive enough that the corporate separation is more formal than real." <u>Id.</u> In making this determination, the court must consider: (1) the financial dependency of the subsidiary on the parent; (2) the parent company's interference in the assignment of the subsidiary's key personnel; (3) the observance of corporate formalities and (4) control by the parent of the day-to-day operation of the subsidiary. <u>Gallelli v.</u> <u>Crown Imps., LLC</u>, 701 F. Supp. 2d 263, 272 (E.D.N.Y. 2010).

Minner argues that the level of control NC exerts over NSL demonstrates that NSL is a "mere department" of NC. (Docket No. 10-1 at 3.) But the facts Minner has produced do not suffice to allege that NSL is a mere department of NC. Minner points first to NC's ownership of all of NSL stock. (Amended Complaint, ¶ 5). This element, while necessary, is not sufficient to establish that the subsidiary is a "mere department." <u>Gallelli</u>, 701 F.

Supp. 2d at 271.

For the second factor, Minner alleges that the two entities share common officers, and that NC does the hiring for NSL. (Amended Complaint, ¶¶ 7, 16.) But these do not suffice to show interference. J.L.B. Equities, Inc. v. Ocwen Fin. Corp., 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) (holding that existence of overlapping officers and directors is "intrinsic to the parent-subsidiary relationship," and is not determinative as to whether the subsidiary is a "mere department" of the parent.)

As to the third factor, Minner does not make any allegations about a lack of corporate formalities.

As to NC's control of NSL's day-to day-operations, Minner alleges that NC does the hiring for NSL, and that the two entities share a website. (Amended Complaint, ¶¶ 16, 11-12.) As to hiring, without more, it does not suggest control over NSL's day-to-day operations. The website, too, does not necessarily show that NC controls NSL's day-to-day operations. J.L.B. Equities, 131 F. Supp. 2d at 550 ("An advertising strategy deciding not to present to its consumers the existence of a parent-subsidiary relationship is not equivalent to a showing that the parent corporation exercises any control over its subsidiary's operational or marketing activities.") Minner has not provided sufficient facts for this Court to find that NSL is a "mere department" of NC.

Although Minner has failed to allege that NSL is a "mere department" of NC, he has sufficiently alleged that NSL acted as NC's agent in servicing loans in New York. Defendants argue that NSL cannot be the agent of NC, because NC is merely a holding company that does not do any loan servicing whatsoever, but this argument is unavailing.

When considering whether an agency relationship exists, a court will consider

whether the subsidiary is carrying out the business of its parent. <u>Gallelli</u>, 701 F. Supp. 2d at 272. An agency relationship will also be found when a subsidiary "does all the business which [the parent corporation] could do were it here by its own officials." <u>Id.</u> at 274 (quoting <u>Jazini</u>, 148 F.3d at 184). When a subsidiary carries out its own business, and not the business of its parent, it will not be considered its parent's agent.

The business of a holding company is considered to be the business of investment. <u>See</u> <u>J.L.B. Equities</u>, 131 F.Supp.2d at 549. A court will not take an allegation that a corporation is a holding company at face value, but will examine the actual business the company engages in. <u>See, e.g.</u>, <u>Gallelli</u>, 701 F. Supp. 2d at 274 (parent company was a holding company where website included a description of the company's corporate structure consistent with the structure described in the Annual Report, showing parent's role as only investor in other companies); <u>J.L.B. Equities</u>, 131 F. Supp. 2d at 549 (subsidiary savings and loan institution engaged in servicing mortgages was not an agent of parent holding company, whose business was holding equity securities); <u>Porter v. LSB Indus, Inc.</u>, 192 A.D.2d 205, 214–15, 600 N.Y.S.2d 867 (4th Dep't 1993) (subsidiary distributor of machine tools was not an agent of parent holding company, whose business was solely investment).

Defendants claim that NC is merely a holding company, and that NSL therefore cannot be considered its agent. Minner argues that NC is a company engaged in servicing student loans. To support his argument, Minner attaches NC's 2015 SEC form 10-k to his amended complaint. (Docket No. 10-3.) On this form, NC (representing itself as "Navient") states that it is "the nation's leading loan management, servicing, and asset recovery company, committed to helping customers navigate the path to financial success." (<u>Id.</u> at

p. 6.) NC claims to service $300 billion in loans for more than 12 million customers. (Id.)

Defendants argue that the affidavit of Michelle Iorio, a senior account analyst at NSL, disproves Minner's allegations. (Docket No. 11 at 8.) Iorio's affidavit states that "Navient Corp. does not conduct any business within the state of New York;" "Navient Corp. does not collect any debts, or service any loans, in the state of New York;" and "Navient Corp. does not service any student loans, collect on any obligations, communicate with borrowers, or furnish information to consumer reporting agencies." (Docket No. 7-4 at pp. 2-4, ¶¶ 6, 14, 17.)

There is a clear contradiction between Navient's SEC filing and Iorio's affidavit. But in assessing personal jurisdiction in the absence of an evidentiary hearing, this Court must resolve all doubts in Minner's favor. A.I. Trade Fin., 989 F.2d at 79-80. Minner has sufficiently alleged that NC is not a holding company but a loan servicer. Even if NC did not perform the acts that allegedly harmed Minner, Minner has adequately alleged that NSL, NC's wholly owned subsidiary, performed NC's business of servicing loans in New York. Personal jurisdiction is therefore proper under CPLR § 301.

## 2. CPLR § 302

New York's long-arm statute authorizes the exercise of personal jurisdiction over non-domiciliaries when their acts in New York are related to the cause of injury. Minner asserts that N.Y. C.P.L.R. § 302(a)(1) applies to NC.

C.P.L.R. § 302(a)(1) contains two requirements relevant to this action: (1) the non-domiciliary must transact business (by itself or through an agent) within the state, and (2) the claim against the non-domiciliary must arise out of that business activity. See Mantello v. Hall, 947 F. Supp. 92, 99 (S.D.N.Y.1996).

It is not yet clear whether it was NC or NSL that Minner spoke to in requesting information about his loans. But in either case, Minner's claim against NC arises out of one of them performing loan servicing within New York. And Minner's claims—deceptive practices, failure to correct a report to a credit reporting agency, and breach of contract—arise out of such loan-servicing activity. Taking Minner's allegations as true, this Court finds that Minner has made a prima facie case for personal jurisdiction over NC under CPLR § 302(a)(1) as well.

### 3. Due Process Clause

If a state's long-arm statute permits personal jurisdiction, a court must next analyze whether exercising personal jurisdiction over a defendant comports with the Due Process Clause of the United States Constitution. This analysis has two components. A court must first determine whether the defendant has sufficient "minimum contacts" with the forum state to justify the court's exercise of personal jurisdiction. See Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). Consistent with due process, a court may only exercise personal jurisdiction over a defendant whose "'conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183–84, 85 L. Ed. 2d 528 (1985) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980)).

A court must then ask whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case. See Int'l Shoe, 326 U.S. at 316. In this analysis, a court must consider: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the

plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163–65 (2d Cir. 2010) (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113–14, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)). "Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Bank Brussels, 305 F.3d at 129 (quoting Metro. Life, 84 F.3d at 568). "Dismissals resulting from the application of the reasonableness test should be few and far between." Metro. Life Ins. Co., 84 F.3d at 575.

Defendants argue that NC does not have the minimum contacts with New York to make personal jurisdiction proper under the Due Process Clause, because as a holding company not in the business of servicing student loans, it has no contacts with New York. (Docket No. 8 at 13.) Minner argues that NC is not merely a holding company, and has minimum contacts with New York through its servicing and management of borrowers' student loans, and through its maintaining a website accessible to New Yorkers and advertising New York jobs. (Docket No. 10-1 at 5, 7.)

The physical presence of a defendant is not needed to establish minimum contacts with a state. Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16 CV 1318 GBDBCM, 2017 WL 825482, at *15–16 (S.D.N.Y. Mar. 2, 2017). "Reaching out" to a state to service customers there can establish a state's personal jurisdiction over a defendant. Burger King, 471 U.S. at 475–76.

Sales of goods or services over an interactive website in a state can establish the

minimum contacts necessary for due process to be met. <u>See, e.g.</u>, <u>Chloé</u>, 616 F.3d at 171 (offering and selling bags—including at least one counterfeit Chloé bag—to New York consumers established jurisdiction over non-domiciliary defendant); <u>Gucci Am., Inc. v. Frontline Processing Corp.</u>, 721 F. Supp. 2d 228, 245 (S.D.N.Y. 2010) (finding minimum contacts where credit card processing service provider operated a website viewable in New York, did business with internet merchants who sold goods into New York, and had some New York clients); <u>Student Advantage, Inc. v. Int'l Student Exch. Cards, Inc.</u>, No. 00 CIV. 1971 (AGS), 2000 WL 1290585, at *5 (S.D.N.Y. Sept. 13, 2000) (personal jurisdiction existed because, in part, defendant's website was interactive).

On the other hand, many courts have declined to find that jurisdiction based on a passive website suffices under the Due Process clause. <u>See</u> <u>Eternal Asia Supply Chain Mgmt. (USA) Corp. v. Chen</u>, 12 Civ. 6390, 2013 WL 1775440, at *9 (S.D.N.Y. Apr. 25, 2013) (collecting cases).

Here, Minner alleges that Defendants acted in New York both related to his own loans and to customers more generally. For himself, he provides correspondence from Defendants to his New York address regarding income-driven repayment options. (Docket No. 5-4 at p. 1.) As to New York more generally, Minner alleges that Defendants maintain a common website at Navient.com. (Amended Complaint, ¶ 60.) This website contains information regarding loan servicing options. (<u>Id.</u>) Because Minner refers to the website in his Amended Complaint, this Court will consider it for jurisdictional purposes. [1] The website has an area for borrowers to log in with individualized credentials to access

---

[1] The Court notes that in adjudicating this motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied

their accounts. It thus appears to be an "interactive" website where borrowers can receive Defendants' services. Resolving all doubts in Minner's favor, Minner has alleged that NC has minimum contacts with New York.

Finally, the reasonableness inquiry favors Minner. As to the first factor—the burden on the parties—NC, as a major corporation, can better afford the expense of travel than can Minner, who alleges financial difficulty. As to the second factor, New York clearly has an interest in ensuring that its citizens are not deceived by debt servicers. As to the third factor—the plaintiff's interest in relief—Minner alleges ongoing harm to his credit score, and consequent inability to obtain a home mortgage, so his interest in relief is high. (See, e.g., Docket No. 5-3, 5-5.) The fourth and fifth factors in the reasonableness inquiry appear to be neutral. For these reasons, this case does not present the "exceptional situation" where "the exercise of jurisdiction is unreasonable even though minimum contacts are present." Joint Stock Co. Channel One, 2017 WL 825482, at *16 (citing Bank Brussels, 305 F.3d at 130). The exercise of personal jurisdiction over NC comports with Due Process and Defendants' motion to dismiss on that ground will therefore be denied.

## B.      Failure to State a Claim

Defendants argue that Minner has not alleged sufficient facts to state a claim against them for violation of GBL § 349, breach of FCRA §1681s-2, or breach of contract. Minner argues that he has alleged sufficient facts to state a claim for all three of his causes

---

on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." Kapsis v. Am. Home Mortg. Servicing Inc., 923 F. Supp. 2d 430, 438 (E.D.N.Y. 2013) (citing In re Merrill Lynch & Co., 273 F.Supp.2d 351, 356–57 (S.D.N.Y. 2003) (internal citations omitted), aff'd in part and reversed in part on other grounds sub nom., Lentell v. Merrill Lynch Co., 396 F.3d 161 (2d Cir. 2005).

of action.

### 1. Rule 12 (b)(6)

Rule 12 (b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12 (b)(6). Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim.  Fed. R. Civ. P. 8(a)(2).  But the plain statement must "possess enough heft to show that the pleader is entitled to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.  Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Legal conclusions, however, are not afforded the same presumption of truthfulness.  See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.")

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged.  Iqbal, 556 U.S. at 678.  The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief.  Id.; Fed. R. Civ. P. 8(a)(2).  Well-pleaded

allegations in the complaint must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

A two-pronged approach is thus used to examine the sufficiency of a complaint, which includes "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). This examination is context-specific and requires that the court draw on its judicial experience and common sense. Iqbal, 556 U.S. at 679. First, statements that are not entitled to the presumption of truth—such as conclusory allegations, labels, and legal conclusions—are identified and stripped away. See id. Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief." Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim. Id.

### 2. GBL § 349 Claims

New York General Business Law § 329(a) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." The scope of GBL §349 is "broad indeed." Wilner v. Allstate Inc. Co., 71 A.D.3d 155, 893 N.Y.S.2d 208, 212 (2d Dep't 2010).

### a. GBL § 349 is not preempted by the Higher Education Act

Defendants first argue that Minner's § 349 claim is preempted by the HEA. Minner argues that if this is the case, then the HEA establishes Defendants' duty to properly service his loans.

As an initial matter, this Court takes note of the presumption against preemption. "[B]ecause the States are independent sovereigns in our federal system," the Supreme Court has stated, "we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250, 135 L. Ed. 2d 700 (1996). This is particularly true in cases where Congress has "legislated ... in a field which the States have traditionally occupied." Id. In such cases, a court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id.

Federal preemption occurs where Congress has "explicitly stated [as much] in the statute's language," where state law "actually conflicts with federal law," or where "federal law so thoroughly occupied a legislative field as to make reasonable inference that Congress left no room for the States to supplement it." Cipollone v. Liggett Grp., 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992) (citations and internal quotation marks omitted); see also Genna v. Sallie Mae, Inc., No. 11 CIV 7371 LBS, 2012 WL 1339482, at *7 (S.D.N.Y. Apr. 17, 2012). These theories are known as express, conflict, and field preemption, respectively.

### i. Express Preemption

Defendants argue that GBL § 349 is expressly preempted by the HEA, because the HEA bars any additional state disclosure requirements. In making this argument, they cite a Department of Education Directive asserting that state law claims are expressly preempted by the HEA. (Docket No. 11 at p. 13, citing 83 Fed. Reg. 10619-01 (Mar. 12, 2018).) Minner argues that if Defendants argue the HEA controls their dealings with him,

then they must acknowledge their duties to him under that statute.

Express preemption "occurs when Congress withdraws specified powers from the States by enacting a statute containing an express preemption provision." Wurtz v. Rawlings Co., LLC, 761 F.3d 232, 238 (2d Cir. 2014) (citation omitted). "Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." General Motors Corp. v. Abrams, 897 F.2d 34, 41-42 (2d Cir. 1990).

The HEA's preemption provision, 20 U.S.C. § 1098g, states: "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the [HEA] … shall not be subject to any disclosure requirements of any State law." (Docket No. 11 at 13, 16) (quoting 20 U.S.C. § 1098g).

Defendants cite no law to support the proposition that the Department's interpretation of the preclusive effect of the HEA should be persuasive or binding on this Court. See Hyland v. Navient Corp., No. 18CV9031(DLC), 2019 WL 2918238, at *7 (S.D.N.Y. July 8, 2019).

As to the express preemption argument, the parties cite conflicting authorities on the issue. Defendants rely on Chae v. SLM Corp., in which the plaintiffs brought an unfair or deceptive practices claim under California law. 593 F.3d 936 (9th Cir. 2010). In Chae, the Ninth Circuit held that because the allegedly deceptive billing statements and standardized loan applications were "[a] properly-disclosed FFELP practice," they could not "simultaneously be misleading under state law, for state disclosure law is preempted by the federal statutory and regulatory scheme." Id.

Plaintiff relies on Genna v. Sallie Mae, Inc., in which the plaintiff's claims arose

from the defendant's false statement over the telephone that plaintiff's loan was in forbearance and no payment was required. No. 11 CIV. 7371 LBS, 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012). While in <u>Chae</u>, plaintiffs "challenged written statements that were explicitly regulated and sanctioned by federal law," the court in <u>Genna</u> noted that "the statements at issue ... were neither authorized by the Secretary of Education nor conformed to any explicit dictates of federal law." <u>Id.</u>, at *8. Reasoning that "[t]here is nothing in the HEA that standardizes or coordinates how a customer service representative of a third-party loan servicer like Sallie Mae shall interact with a customer ... in the day-to-day servicing of his loan," the court concluded that the HEA did not expressly preempt plaintiff's claims. <u>Id.</u>

Inasmuch as Minner's claims arise from Defendants' unregulated communications over the internet and by telephone, they are similar to those in <u>Genna</u>, and are not subject to express preemption by the HEA. <u>See</u> <u>Davis v. Navient Corp.</u>, No. 17-CV-00992-LJV-JJM, 2018 WL 1603871, at *2–3 (W.D.N.Y. Mar. 12, 2018), <u>report and recommendation adopted,</u> No. 17-CV-0992, 2019 WL 360173 (W.D.N.Y. Jan. 29, 2019). Defendants' argument fails on this ground.

### ii. Conflict Preemption

Conflict preemption occurs "where it is impossible for a private party to comply with both state and federal law" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Genna</u> 2012 WL 1339482, at *8 (citing <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 372–73, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000). Consistent with the presumption against preemption, "pre-emption is ordinarily not to be implied absent an actual conflict." <u>English</u>

v. General Elec. Co., 496 U.S. 72, 90, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990). "[S]tate causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." California v. ARC America Corp., 490 U.S. 93, 105, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989).

GBL § 349 imposes additional liability on those who mislead consumers, but it is not impossible to comply with both statutes, nor does the requirement not to deceive stand as an obstacle to Congress's objectives in passing the HEA. This Court therefore finds no conflict preemption.

### iii.  Field Preemption

A court will find field preemption when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." Cipollone, 505 U.S. at 516 (quoting Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153, 102 S. Ct. 3014, 3022, 73 L. Ed. 2d 664 (1982)).

Courts that have considered the question agree that field preemption does not apply to the HEA. See Genna, 2012 WL 1339482 at *7. See also, Chae, 593 F.3d at 941–942 ("field preemption does not apply to the HEA"); Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc., 168 F.3d 1362, 1369 (D.C. Cir. 1999) ("federal education policy regarding [private lending to students] is not so extensive as to occupy the field"). GBL § 349 covers a broad range of deceptive practices, and aims to provide general consumer protection. This Court does not find that Congress intended to occupy the entire consumer protection field when it enacted the HEA.

### iv.  GBL § 349(d)'s Preemption provision

GBL § 349(d) states that "it shall be a complete defense that the [challenged] act

or practice is ... subject to and complies with the rules and regulations of … any … agency of the United States." Defendants argue that this section of the GBL preempts Minner's claim, because their communications with Minner complied with HEA disclosure requirements. (Docket No 11 at 13.) (citing 34 C.F.R. § 682.205 and 34 C.F.R. § 685.210.)

Defendants' statements to Minner over the telephone regarding what his best option would be, given his circumstances, are not the kind of "disclosures" envisioned by the regulations Defendants cite. This is because the HEA does not mandate any kind of truthfulness in telephone communications between borrowers and lenders or loan servicers, and thus does not cover the conduct at issue. Therefore, these statements cannot be said to comply with any federal regulations, and are not covered by § 349(d)'s savings clause.

### b. Minner states a claim for deceptive acts under GBL § 349

Defendants argue that, even if § 349 is not preempted by the HEA, Minner fails to state a claim under § 349 because he has not alleged deceptive acts or materially misleading conduct as required by the statute. (Docket No. 11 at 13.) Minner argues that he has alleged sufficient facts to state a claim.

To state a claim for a violation of § 349, a plaintiff must allege (a) that the challenged act or practice was consumer-oriented; (b) that it was misleading in a material way; and (c) that the plaintiff suffered injury as a result of the deceptive act. Genna, 2012 WL 1339482, at *7 (citing Stutman v. Chem. Bank, 95 N.Y.2d 24, 731 N.E.2d 608, 611, 709 N.Y.S.2d 892 (N.Y. 2000)).

### i. Consumer-oriented behavior

For the first prong, a plaintiff must allege that defendant's conduct has or had a

"broad impact on consumers at large."" <u>Genna</u>, 2012 WL 1339482, at *7 (citing <u>USAlliance Fed. Credit Union v. CUMIS Inc. Soc'y, Inc.</u>, 346 F.Supp.2d 468, 471 (S.D.N.Y. 2004)). Claims arising from private disputes that are unique to the parties are not actionable. <u>Id.</u>

Here, Minner alleges that Defendants acted wrongfully not only regarding his loans, but for all loans they serviced. (<u>See, e.g.</u>, Amended Complaint, ¶¶ 57, 58, 68, 69, 71, 72, 83, 86, 91, 92, 93, 94.) He attaches complaints from other states that allege similar conduct by Defendants in steering borrowers toward forbearance instead of income-based plans. (Docket Nos. 10-4, 10-5 at pp. 23-333.) Defendants argue that these complaints prove nothing because the cases are still unresolved. (Docket No. 11 at 11-12.) But the complaints support Minner's allegation that Defendants' conduct has affected consumers in a broad sense. Minner also claims throughout his complaint that Defendants' alleged steering impacted similarly-situated borrowers. This Court therefore finds that he has sufficiently alleged consumer-oriented behavior.

### ii.    Materially misleading

For the second prong, a plaintiff must allege that a defendant's actions were materially misleading. Defendants argue that their website accurately states that forbearance is appropriate for those facing temporary financial difficulty, and that Minner was ultimately enrolled in an appropriate income-based repayment plan. (Docket No. 11 at p. 12.) Minner argues that Defendants' representatives misled him when they alleged that they would help him and advised him to seek forbearance, even though they knew he was facing long-term financial difficulties. (Docket No. 12 at p. 5-6.)

This Court finds that Minner has sufficiently alleged misleading statements. Minner

alleges that Defendants encourage borrowers to rely on them for advice about their options. (Amended Complaint, ¶¶ 113-14.) Minner told Defendants he was experiencing "long term financial problems." (Id., ¶ 59.) When Minner sought information regarding his long-term problems, Defendants recommended forbearance, even though their website states that forbearance is appropriate for borrowers facing "temporary financial difficulty." (Id., ¶ 60, 59). This suffices to allege that Defendants materially misled Minner.

### iii. Injury.

Defendants argue that Minner has not alleged an injury, because, although he was initially placed in forbearance, he ultimately entered into an income-based repayment plan. Minner argues that the subsequent change in repayment plan does not eradicate the initial injury.

Minner alleges that being placed in forbearance instead of an income-based plan cost him more than an income-based plan would have. (Amended Complaint, ¶¶ 63, 64, 85.) This suffices to state an injury. Because Minner has met the pleading requirement under GBL § 349, this Court will deny Defendants' motion to dismiss on that basis.

### 3. Fair Credit Reporting Act ("FCRA") claims

Defendants argue that Minner's FCRA claim should be dismissed because Minner has not alleged that they failed to conduct a reasonable investigation as the act requires. Minner argues that he has sufficiently stated a claim under the FCRA.

Although the Second Circuit has not directly addressed the issue, the majority of courts to address the question have found that a private right of action exists for willful or negligent noncompliance with Section 1681s–2(b). See Nguyen v. Ridgewood Sav. Bank, 66 F. Supp. 3d 299, 305 (E.D.N.Y. 2014) (collecting cases).

The Fair Credit Reporting Act provides that after receiving notice of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall conduct an investigation with respect to the disputed information; review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title; report the results of the investigation to the consumer reporting agency; and, if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information. 15 U.S.C. § 1681s-2(b)(1)(A)-(D). If the item disputed by the consumer is found to be inaccurate or incomplete, the furnisher of information must, as appropriate, modify, delete, or permanently block the reporting of that item. Id. § 1681s-2(b)(1)(E).

"To state a claim under Section 1681s-2(b), a plaintiff must allege that (1) defendants received notice of a credit dispute from a credit reporting agency, and (2) defendants thereafter acted in willful or negligent noncompliance with the statute." Cummins v. Select Portfolio Servicing, Inc., No. 14 CV 5121 (MKB)(LB), 2016 WL 11395016, at *5 (E.D.N.Y. Aug. 23, 2016), report and recommendation adopted, No. 14CV5121MKBLB, 2016 WL 4766237 (E.D.N.Y. Sept. 13, 2016) (citing Redhead v. Winston & Winston. P.C., No. 01 Civ. 11475, 2002 WL 31106934, at *5 (S.D.N.Y. Sept. 20, 2002)).

Here, Minner alleges in his amended complaint that Defendants submitted a false report of his default to CRAs, that he made a formal complaint to the CRAs to dispute the incorrect reports, and that Defendants were informed of the issue by the CRAs. (Amended Complaint, ¶¶ 130-31.) Minner further alleges that Defendants failed to correct the reports

they sent to CRAs. (Id., ¶¶ 132-33.)

Defendants argue that Minner's failure to allege that their investigation was unreasonable destroys his claim. (Docket No. 11 at 17.) But this is not a pleading requirement in the Second Circuit. See Cummins, 2016 WL 11395016, at *5. Minner has sufficiently stated a claim under § 1681s-2(b), and Defendants' motion to dismiss on that ground will therefore be denied.

### 4. New York Breach of Contract Claim

Defendants argue that Minner has not pleaded a cause of action for breach of contract because there was no contract between Defendants and Minner, and because Defendants are not in privity with Minner simply by servicing his loans. Minner argues that his claim is for breach of the implied covenant of good faith and fair dealing, and that Defendants owed him a duty under this covenant because they are in the "functional equivalent of privity" with his original loan issuer, the Department of Education.

The implied covenant of good faith and fair dealing prevents any party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 93 (2d Cir. 2013).

To state a claim for breach of the covenant of good faith and fair dealing, a plaintiff must allege that: (1) defendant owed plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant breached that duty; and (3) the breach of duty proximately caused plaintiff's damages. Washington v. Kellwood Co., 05 Civ. 10034(DAB), 2009 WL 855652 at *6 (S.D.N.Y. Mar. 24, 2009) (quoting Boyd v. Univ. of Illinois, 96 Civ. 9327(TPG), 2001 WL 246402, at *10 (S.D.N.Y. Mar. 13, 2001)). While the implied covenant of good faith

and fair dealing does not "imply obligations inconsistent with other terms of the contractual relationship," it does encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Madison Capital Co., LLC v. Alasia, LLC, 615 F. Supp. 2d 233, 239 (S.D.N.Y. 2009); see also Vista Outdoor Inc. v. Reeves Family Tr., 725 F. App'x 17, 21 (2d Cir. 2018).

The implied covenant does not "undermine a party's general right to act on its own interests in a way that may incidentally lessen" the other party's expected benefit. Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807, 817–18 (2d Cir. 2014) (citing M/A–COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir.1990) (per curiam)). A plaintiff must therefore show more than evidence that the defendant's actions were misguided, ignorant, or negligent. Wagner v. JP Morgan Chase Bank, No. 06–Civ–3126(RJS), 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011).

Defendants argue that they owe Minner no duty because they are not parties to the contract between Minner and DOE. Minner argues that Defendants assumed the rights and duties of a signatory to the contract by taking on the servicing of the loans. (Docket No. 12 at 9-10.)

New York law allows privity to be imputed to an agent of the contracting party under certain narrow circumstances. Kapsis v. Am. Home Mortg. Servicing Inc., 923 F. Supp. 2d 430, 451 (E.D.N.Y. 2013). "[W]hen [a] subcontractor (or third-tier subcontractor) is engaged on behalf of the owner (or subcontractor), for the benefit of the owner (or subcontractor), and with the knowledge of all parties, then the 'functional equivalent of privity' exists. The essential element of this doctrine is that the middle party works as the agent for the principal with the knowledge of all parties. In re Cavalry Const., Inc., 428

B.R. 25, 31 (S.D.N.Y. 2010), aff'd sub nom. In re Cavalry Const., 425 F. App'x 70 (2d Cir. 2011). "The determination of whether the 'functional equivalent of privity' exists ... is a highly fact-dependent endeavor which must consider the de facto dealings between the relevant parties as well as the language of all relevant contracts." Id.

Here, Minner signed the MPN with DOE for his education loans. To establish Defendants' relationship with DOE, Minner provides NC's SEC 10-k form, on which Defendant NC claims that it services loans owned by DOE (Docket No. 10-3 at p. 6.) He also submits a letter, addressed to himself, from "Navient," explaining how he can apply for an Income-Based Repayment plan. (Docket No. 5-4 at 1.) This suffices, at this stage, to suggest that Defendants are carrying out DOE's loan servicing duties, and allows this Court to find the "functional equivalent of privity" between Minner and Defendants.  As such, pursuant to the covenant of good faith and fair dealing, Defendants owed Minner a duty not to deprive him of the benefits of the contract. The MPN refers several times to the lender's providing "information" to the borrower. (See Docket No. 7-2 at pp. 6-8.) A reasonable person would assume this meant "suitable" information. See Madison Capital, 615 F. Supp. 2d at 239. Thus, the implied covenant of good faith can be said to encompass the duty to give reasonable, or suitable, information.

To allege a breach of this covenant, Minner must allege more than Defendants' negligence or poor business judgment. See Wagner, 2011 WL 856262, at *4. Here, Minner alleges that Defendants incentivized customer service representatives to push forbearance, sometimes without even mentioning an income-driven repayment plan. (Amended Complaint, ¶¶ 72-74.) This was because forbearance required only minutes to set up, while income-driven repayment plans required extensive documentation and took

much more time (Id., ¶¶ 75-82.) Encouraging forbearance, even if it was inappropriate for borrowers, thus saved Defendants money, to the detriment of borrowers. At this stage, Minner has sufficiently alleged that more than mere negligence caused Defendants to give him inappropriate advice.

Finally, Minner has alleged a harm from Defendants' breach, because he paid more due to forbearance than he would have in a more appropriate, income-driven plan. (Id., ¶ 85.)

Because of the foregoing, this Court finds that Minner has alleged a claim for breach of the covenant of good faith and fair dealing, and Defendants' motion to dismiss on that basis will therefore be denied.

## IV. CONCLUSION

For the reasons stated above, Minner's motion to amend is granted, and Defendants' motion to dismiss is denied.

## V. ORDERS

IT HEREBY IS ORDERED, that Minner's Cross-Motion to Amend (Docket No. 10) is GRANTED.

FURTHER, that Minner shall file his amended complaint (Docket No. 10-5 at pp. 1-22) within 7 days of the entry date of this decision.

FURTHER, that Defendants' Motion to Dismiss (Docket No. 6) is DENIED.

FURTHER, that Defendants shall file an answer to the amended complaint within 14 days of its filing.

SO ORDERED.

Dated:      February 25, 2020
              Buffalo, New York

<u>s/William M. Skretny</u>
WILLIAM M. SKRETNY
United States District Judge